EDITHA J. DAWSON v. H. W. MERRILLE.

THIS was an appeal from a judgment of the district court for Lancaster county. The cause was tried, and decision rendered at the July term, 1872. A statement of the case and opinion by *Mason, Ch. J.*, appears in 2 *Neb*, 119. The following opinion of *Mr. Justice Crounse*, was, however, overlooked in the publication of that volume.

CROUNSE, J.

The trial in this case was to the court. No request was made under section 297 of the civil code, for a separate statement of conclusions of facts from those of law, and we cannot therefore see upon what the determination of the court proceeded, nor well review the several propositions discussed by counsel. Still, from the record brought here, I cannot discover how any other conclusion could have been reached than that arrived at.

The alleged contract, to enforce which, against the defendant, this action was brought, purports to be the mutual agreement of the subscribers thereto, upon "consideration of the mutual agreements and covenants therein expressed." What are these agreements and covenants? Among them cannot be "the express condition that the capitol and other public buildings be located at, or adjoining, Lancaster." The location of the capitol is a state matter, a subject of public concern with which none of the subscribers had anything to do, or which they could in any way lawfully influence. More than this, none of the subscribers undertook to build, or to have built, the capitol at Lancaster. There is no mutuality in this.

The only other suggestion of a foundation is the promise of the other subscribers. This will not bear

examination. A simple agreement by ten persons each to give A. one hundred dollars is without consideration —a *nudum pactum*. 1 *Pars. on Contracts, 4th Ed.*, 378. Nor is the promise more binding by agreeing that all or any portion of the money so promised shall be paid to such one of the number as a majority may designate. In such case it would be open to the further objection, that it would be in the nature of a gambling or wagering contract. Where, for a valid consideration, one agrees to convey his farm to him who shall be named by any person, or number of persons, mentioned, I concur with counsel that such an agreement is valid. But the case is different where the consideration of the promise is, that the person agreeing to convey is to have a chance that he may be the person to whom lands may be conveyed by others making like promises.

Then, again, how, or upon what basis is the fortunate grantee to be determined? The writing leaves this very uncertain. It says the subscribers shall convey to " such of the parties hereto as may be agreed upon by a majority." When and where is that agreement to be made? Shall it be upon meeting of all, or by a majority upon notice to all? It seems that the mere chance of the defendant, resting upon no rule or basis as disclosed by the writing, was subject to be destroyed by the arbitrary disposition of a majority. Whether this majority may have reached their conclusions by throw of dice, or with reference to some right or order, would appear to be a matter of no great consequence. The fact that they did agree that Merrille should convey to Dawson, it is insisted, is sufficient. How the court found as to the fact that a majority did agree, we are uninformed in the absence of special finding. Did it appear, however, that the court found against the plaintiff, I should be slow to interfere with its finding. Where the plaintiff's right depends upon the decision of a majority, the court might well

insist that an unequivocal decision, by a clear majority, be made out by undoubted proof. But upon the face of the writing I am of the opinion that it is too uncertain in this particular. It can be fairly gathered from it that one of the inducements to, or a part consideration for, defendant's parting with his land, was that he might by some chance or rule receive it or some other land in return. This contingency rested on the agreement of a majority. From the contract it should appear how this was to be effected—upon what basis it was to proceed, so that the parties interested might resist an improper determination, or insist on their rights under it.

Conceding that the agreement shows, or by the introduction of other evidence can be made to show, all that is claimed by the plaintiff, to-wit: that, in order to secure the location of the state capital at Lancaster, around which place the several subscribers were the owners of lands like to be enhanced in value by such location, the parties agreed to donate to the state certain lands, and to such of the parties whose lands might be taken for capital purposes more than they should in fairness contribute, still, the plaintiff in prosecuting his action is opposed by other insuperable propositions of law. The act providing for the location of the capital and state buildings, makes the governor, secretary of state, and auditor, commissioners for the purpose of such location. On or before the 15th day of July, 1867, they were required on actual view, to select from the lands belonging to the state, within certain prescribed limits, a suitable site of not less than six hundred and forty acres in a body, due regard being had to its accessibility from all parts of the state, and its general fitness for a capital. *Laws of 1867*, 52. The state asked no donations, nor empowered the commissioners to receive any. Very evident reasons suggest themselves for having the capital located on lands belong to the state. The state owned large quantities of

lands, and by the location of the capital on some part of them, the balance thereabouts must necessarily be enhanced in value. Whether these donations were to be given in part to those who were most influential with the commissioners; whether any portion was to be given to the commissioners, or any of them; or whether to be given to the state does not appear. It is very evident, however, the purpose was to influence the action of the commissioners, and that, too, in the interest and to the profit of the donors, regardless of the interest of the state. In this respect the agreement is against public policy, and a court of equity will not lend its aid in its enforcement.

Again, it is admitted that the lands in question were entered and settled upon by the defendant as a homestead under the laws of the United States, and upon which he had some years yet to live before he could obtain a patent for it from the government. The very admission shows that the defendant had no title in law, or right in equity, that he could convey. But, it is said, it was understood that the several tracts were to be conveyed as soon as the legal title should be acquired by the respective signers. This is not so said in the writing, nor is it consistent with that provision which says that " said conveyances are to be executed immediately upon the location being announced by the commissioners." To show a different agreement, or to modify that introduced as having been entered into in writing, would be a violation of the most elementary rules. 1 *Greenleaf Ev., Sec.* 275. *Pym v. Blackburn,* 3 *Sumner's Ves.,* 38. With more plausibility might the defendant contend that his agreement was to abandon his homestead right so that the party designated might enter as a pre-emptor or for the purpose of a homestead, than that the plaintiff could claim that he had bargained for years of toil, residence, and cultivation, by the defendant and his family, in order that a patent might be obtained which should be handed

over at once to the plaintiff. A written contract would be of little consequence if, in so important particulars, the matter must rest in parol.

However, let the plaintiff be indulged in the still further concession, that such was the understanding, he then is no better off. Such agreement is opposed to the spirit of the Homestead Act. The act evidently proceeded from a desire to benefit the poor man, and the man of limited means who might be desirous of possessing a home for himself and family. While the government demands good faith and an honest purpose on the part of the applicant for its bounty, it protects him carefully in the attainment of his object. The person seeking to avail himself of the benefit of this law must make oath that the land entered is taken for the purpose of actual settlement, and that it is not directly, or indirectly, for the benefit of any other person or persons whatsoever. In applying for his patent, after five years residence, he must again swear, among other things, that no part of the land has been alienated. *Chap. 75, Acts and Res., 2d Sess. 37th Congress.* More than this, no lands acquired under the act shall in any event become liable for the satisfaction of any debt contracted prior to the issuing of any patent therefor. But we are told that here was no alienation—simply an agreement to convey—and because there is no inhibition against agreeing to convey, such agreement must stand. It is true that there was no alienation in fact, for the very good reason that the defendant had no title to convey. "It is laid down as a general rule," says Bacon, (*Abr. Tit. Grants, D. 2,*) "that a man cannot grant or charge that which he hath not." Any right of the plaintiff to a conveyance from the defendant, after receiving his patent, relates back to and is founded upon the alleged agreement, when he had no estate to convey, and when he was expressly forbidden to alien. Yet we are asked, by ingenious construction, to say that an applicant can, in

one hour, enter upon a piece of government land, making oath that he does so for the purpose of actual settlement, and not directly or indirectly for the use or benefit of any other person or persons whomsoever, and, in the next hour, such other person, whom the policy of the law excludes, can make a valid agreement which shall wrest the title from the settler as soon as it is obtained from the United States. In other words, we are requested to hold that while the settler cannot alien by deed in form, he can do so by another writing which will be equally efficacious, if this court will only declare it so. It would illy become a court of equity to thus lend its aid in the contravention of the manifest provisions of the act designed for the benefit of poor homesteaders. The judgment of the court below must be affirmed.

JUDGMENT AFFIRMED.